**MASTI–KURE PRODUCTS COMPANY, INC., Petitioner,**

v.

**Joseph A. CALIFANO, Jr., Secretary of U. S. Department of Health, Education and Welfare, Donald Kennedy, Commissioner of Food and Drugs, Food and Drug Administration and C. D. Van Houweling, Director, Bureau of Veterinary Medicine, Food and Drug Administration, Respondents.**

**No. 76–1146.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 11, 1978.

Decided June 16, 1978.

---

David Chiras, of the Bar of the Supreme Court of Rhode Island, pro hac vice by special leave of Court with William F. Casler, Sr., St. Petersburg Beach, Fla., Carleton L. Weidemeyer, Clearwater, Fla., William J. Bethune and Mark W. Foster, Washington, D. C., were on the brief, for petitioner.

Also John P. Meade, Washington, D. C., entered an appearance for petitioner.

J. Patrick Glynn, Atty., Dept. of Justice, St. Louis, Mo., with whom Charles R. McConachie, Acting Chief, Consumer Affairs Section, Dept. of Justice, Washington, D. C., was on the brief, for respondents.

Before BAZELON, McGOWAN and MacKINNON, Circuit Judges.

Opinion for the Court filed by Circuit Judge BAZELON.

BAZELON, Circuit Judge:

On February 17, 1976, the Deputy Commissioner of Food and Drugs issued an or-

der withdrawing approval of new animal drug application (NADA) 65–381 and denying a request for a hearing. 41 Fed.Reg. 7141 (1976). The drug covered by NADA 65–381 is a fixed combination drug containing in each 14-milliliter dosage unit procaine penicillin G (100,000 units) and neomycin sulfate (25 milligrams). The drug is designed for treatment of acute and chronic mastitis in lactating cows. Masti-Kure Products Company, Inc., producer of the drug, petitions this court to set aside the Deputy Commissioner's order. *See* 21 U.S.C. § 360b(h).

## I. BACKGROUND

A. *The Statutory and Regulatory Framework*

The Federal Food, Drug, and Cosmetic Act (the Act) prohibits the marketing in interstate commerce of any new animal drug[1] unless an NADA for the drug has been approved. *See* 21 U.S.C. §§ 360b(a)(1)(A), 351(a)(5), 331(a). The Act states that the Commissioner of the Food and Drug Administration (FDA) may withdraw approval of an NADA if he finds "on the basis of new information before him with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substantial evidence that such

drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof . . . ." 21 U.S.C. § 360b(e)(1)(C). The Act defines "substantial evidence" to mean:

> evidence consisting of adequate and well-controlled investigations, including field investigation, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and reasonably be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.

21 U.S.C. § 360b(d)(3).

FDA has promulgated regulations implementing this statutory scheme. *See* 21 U.S.C. § 371(a); 21 C.F.R. § 5.1(a)(1) (1977). It has required that for a fixed combination new animal drug such as that covered by NADA 65–381, substantial evidence must be provided both that the drug is effective for its intended use and that "[e]ach ingredient designated as active" contributes to the claimed effects. 21 C.F.R. § 514.-1(b)(8)(v) (1977). In addition, FDA has by regulation set out standards for "adequate

---

1. The Act defines the term "new animal drug" to mean:

any drug intended for use for animals other than man, including any drug intended for use in animal feed but not including such animal feed,—

    (1) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof; except that such a drug not so recognized shall not be deemed to be a "new animal drug" if at any time prior to June 25, 1938, it was subject to the Food and Drug Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use; or

    (2) the composition of which is such that such drug, as a result of investigations to

determine its safety and effectiveness for use under such conditions, has become so recognized but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions; or

    (3) which drug is composed wholly or partly of any kind of penicillin, streptomycin, chlortetracycline, chloramphenicol, or bacitracin, or any derivative thereof, except when there is in effect a published order of the [Commissioner] declaring such drug not to be a new animal drug on the grounds that (A) the requirement of certification of batches of such drug, as provided for in section 360b(n) of this title, is not necessary to insure that the objectives specified in paragraph (3) thereof are achieved and (B) that neither subparagraph (1) nor (2) of this paragraph (w) applies to such drug.

21 U.S.C. § 321(w).

and well-controlled investigations" acceptable as substantial evidence of effectiveness.[2]

When the Commissioner determines, on the basis of new information before him, that an approved NADA lacks substantial evidence of effectiveness, FDA regulations require him to notify the holder of the NADA in writing and "afford an opportunity for a hearing on a proposal to withdraw approval of such application." 21 C.F.R. § 514.115(b) (1977). *Cf.* 21 U.S.C.

§ 360b(e)(1). FDA has developed summary judgment procedures, however, to be used when the holder of an NADA fails to submit substantial evidence of drug effectiveness sufficient on its face to meet regulatory standards.[3] The Supreme Court has in principle approved such procedures, stating that, "[w]e cannot impute to Congress the design of requiring, nor does due process demand, a hearing when it appears conclusively from the applicant's 'pleadings' that the application cannot succeed." *Weinber-*

**2.** *See* 21 C.F.R. § 514.111(a)(5) (1977):

An adequate and well-controlled investigation must satisfy the following criteria:

(i) A clear statement of the objective of the study is provided.

(ii) The method of selection of the animals to be studied and those to serve as controls provides for:

(a) Adequate confirmation of the disease or clinical state present, including criteria of diagnosis and any appropriate confirmatory laboratory tests.

(b) Assignment of the animals and control groups to test under conditions which exclude or minimize bias.

(iii) An outline and explanation of the methods of quantitation and observation of the parameters studied in the subjects.

(iv) A description of the steps taken to document comparability of variables such as species, age, sex, duration, and severity of disease, management practices, and use of drugs other than those being studied.

(v) A description of the methods of recording and analyzing the animal response variables studied and the means of excluding bias or minimizing bias in the observations.

(vi) A precise statement of the nature of the control group against which the effects of the new treatment modality can be compared. Three types of controlled comparisons are possible:

(a) Placebo control: The new animal drug entity may be compared quantitatively with an inactive placebo control. The level of blinding may affect the validity of the observation and comparisons.

(b) Active drug control: The new animal drug entity may be compared quantitatively with another drug or modality known to be effective.

(c) Historical control: In some circumstances involving diseases with high and predictable mortality or with signs and symptoms of predictable duration or severity, the results of use of a new animal drug entity may be compared quantitatively with prior experience historically derived from the adequately documented natural history of the disease in comparable animals with no treat-

ment or with treatment with an established effective therapeutic regimen.

(vii) A summary of statistical methods used in analysis of the data derived from the subjects.

**3.** *See* 21 C.F.R. § 514.200 (1977):

(a) The notice to the applicant of opportunity for a hearing on a proposal by the Commissioner to refuse to approve an application or to withdraw the approval of an application will specify the grounds upon which he proposes to issue his order. On request of the applicant, the Commissioner will explain the reasons for his action. The notice of opportunity for a hearing will be published in the FEDERAL REGISTER and will specify that the applicant has 30 days after issuance of the notice within which he is required to file a written appearance electing whether:

(1) To avail himself of the opportunity for a hearing; or

(2) Not to avail himself of the opportunity for a hearing.

(b) If the applicant elects to avail himself of the opportunity for a hearing, he is required to file a written appearance requesting the hearing within 30 days after the publication of the notice, giving the reason why the application should not be refused or should not be withdrawn, together with a well-organized and full-factual analysis of the clinical and other investigational data he is prepared to prove in support of his opposition to the Commissioner's proposal. A request for a hearing may not rest upon mere allegations or denials, but must set forth specific facts showing there is a genuine and substantial issue of fact that requires a hearing. When it clearly appears from the data in the application and from the reasons and a factual analysis in the request for the hearing that no genuine and substantial issue of fact precludes the refusal to approve the application or the withdrawal of approval of the application (for example, no adequate and well-controlled clinical investigations to support the claims of effectiveness have been identified), the Commissioner will enter an order on this data, stating his findings and conclusions.

*ger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 621, 93 S.Ct. 2469, 2479, 37 L.Ed.2d 207 (1973).

### B. *Proceedings Before FDA*

On August 30, 1974, FDA published in the Federal Register a notice proposing to withdraw approval of NADA 65–381.[4] 39 Fed.Reg. 31678 (1974). The notice stated there were insufficient data to demonstrate that the ingredients of NADA 65–381 were effective in accordance with the requirements for fixed combination drugs as set forth in 21 C.F.R. § 514.1(b)(8)(v) (1977).[5] Masti-Kure thereupon requested a hearing and submitted data purporting to demonstrate the efficacy of the drug covered by NADA 65–381. Joint Appendix (J.A.) at 160. On March 5, 1975, FDA served upon Masti-Kure a proposed order analyzing Masti-Kure's submission and concluding that summary judgment should be instituted since the data submitted failed on its face to meet regulatory standards. J.A. at 684. Masti-Kure was given sixty days "to respond with sufficient data, information, and analyses to demonstrate that there is a genuine and substantial issue of fact which justifies a hearing." *Id.* Masti-Kure responded on May 9 with a revised evidentiary submission. FDA concluded, however, that the deficiencies in the data were unremedied, and, on February 17, 1976, issued its final order withdrawing approval of NADA 65–381 and denying Masti-Kure's request for a hearing. 41 Fed.Reg. 7141 (1976).

### II. THE APPROPRIATENESS OF SUMMARY JUDGMENT

The drug covered by NADA 65–381 is a combination antibiotic containing penicillin and neomycin. It is designed to treat mastitis in lactating cows. Masti-Kure's rationale for combining penicillin and neomycin in a single drug is that bovine mastitis is an infectious disease that results from pathogenic microorganisms, principally *Streptococcus agalactiae* (strep) and *Staphylococcus aureus* (staph). Although penicillin is usually effective in eliminating the infection caused by strep, it is sometimes ineffective against staph, which is known to produce an enzyme capable of destroying penicillin. Neomycin, it is postulated, is usually effective against staph, although not against strep. In actual field use, infecting organisms are not identified and the susceptibility patterns not determined before commencing treatment of mastitis. Use of penicillin or neomycin alone, therefore, will produce treatment failures in cows infected with organisms resistant to the drug used. Combining the drugs will result in fewer failures, because an infection resistant to one may respond to the other.

To substantiate that the drug covered by NADA 65–381 is thus effective under the combination drug policy, 21 C.F.R. § 514.-1(b)(8)(v) (1977), Masti-Kure must demonstrate the validity of two assumptions. First, it must show that the combination of penicillin and neomycin is more effective in treating staph infections than is penicillin alone. Second, and more critical, it must show that in a population of cows with bacteriologically uncharacterized mastitis infections—which is the intended patient population under Masti-Kure's rationale—there exists a statistically significant proportion of infections that are resistant to

---

4. The notice also proposed to withdraw approval of a number of other antibiotic combination drugs designed for the treatment of bovine mastitis. The order was based on the conclusion of a National Academy of Sciences—National Research Council (NAS–NRC) Drug Efficacy Study Group, *see Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 614–15, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), that there was a lack of substantial evidence that these drugs were effective for their intended use. 39 Fed.Reg. 31678 (1974). Contrary to petition-

er's arguments, brief for petitioner at 32, we consider this sufficient "new information" to justify the Commissioner in commencing withdrawal procedures not only of the drugs specifically mentioned by the NAS–NRC Panel, *see* 35 Fed.Reg. 6602 (1970), but also of all drugs "identical, related, or similar" to these drugs. *See* 21 C.F.R. § 310.6(a) (1977). *See Bell v. Goddard,* 366 F.2d 177, 181 (7th Cir. 1966).

5. This requirement was then codified at 21 C.F.R. § 135.4a(b)(8)(v) (1974).

one of NADA 65–381's two ingredients but susceptible to the other (or that the combination for any reason cures more infections than does either of its components alone). *See* 41 Fed.Reg. at 7142.

Masti-Kure must demonstrate the validity of these two assumptions through "evidence consisting of adequate and well-controlled investigations, *including field investigation* . . . ." 21 U.S.C. § 360b(d)(3) (emphasis added). Masti-Kure submitted to FDA two field investigations, one conducted in 1973, and one in 1974. Applying its regulatory criteria of adequate and well-controlled investigations, *supra* note 2, FDA found numerous deficiencies in both studies. Should we find each study to be conclusively deficient with respect to even a single regulatory standard, we must sustain FDA's February 17, 1976 order.[6]

Our inquiry is controlled by *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S.

609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). In that case the Supreme Court examined FDA regulations specifying standards for the "well-controlled investigations" required by the Act to demonstrate the efficacy of new drugs designed for human use, and concluded that they provided "drug manufacturers . . . full and precise notice of the evidence they must present to sustain their NDA's . . . ."[7] *Id.* at 622, 93 S.Ct. at 2479.[8] Given such specific regulations, FDA was not required to "provide a formal hearing where it is apparent at the threshold that the applicant has not tendered *any* evidence which *on its face* meets the statutory standards as particularized by the regulations." *Id.* at 620, 93 S.Ct. at 2478. This reasoning, of course, only applies "to those regulations that are precise." *Id.* at 621 n. 17, 93 S.Ct. at 2479. The Court offered as an example of a "pre-

6. Masti-Kure had in addition submitted an experimental infection investigation conducted by Guy Morse and Russell Rhodes. FDA in its February 17, 1976 order characterized this investigation as "clinical" and as neither well-controlled nor adequate. FDA concluded, however, that:

> Masti-Kure must demonstrate, by adequate and well-controlled field investigations, that the drug covered by NADA 65–381 has the effect it is purported or represented to have under the conditions of use prescribed, recommended, or suggested in its labeling (21 U.S.C. 360b(d)(3)). Therefore, even if the experimental infection study met the criteria for an adequate and well-controlled investigation, and supported Masti-Kure's rationale for the combination, neither of which is the case, that study alone cannot provide the substantial evidence of effectiveness necessary to prevent withdrawal of approval of NADA 65–381. This is so not only because of the statutory requirement, but also because Masti-Kure's rationale for the combination requires it to demonstrate the existence of a naturally occurring population of mastitis infections resistant to one component and susceptible to the other, which can only be done in a field investigation.

41 Fed.Reg. at 7145. *See* 21 C.F.R. § 514.-1(b)(8)(ii) (1977).

7. New drugs designed for human use, *see* 21 U.S.C. § 321(p), can be marketed only if approved new drug applications (NDA's) are on file at FDA. The reasoning and conclusions of *Weinberger* apply in full to the statutory and regulatory scheme for new animal drugs. *See*

*Hess & Clark, Division of Rhodia, Inc. v. FDA,* 161 U.S.App.D.C. 395, 405, 495 F.2d 975, 985 (1974).

8. We find no merit to petitioner's claim that the changing nature of FDA regulations was so confusing as to fail to provide adequate notice of regulatory requirements. *Compare* 21 C.F.R. §§ 135.4a(b)(8)(v), 135.12(a)(5) (1972) *with* 21 C.F.R. §§ 514.1(b)(8)(v), 514.111(a)(5) (1977). We dismiss as frivolous petitioner's contention that the phrase, "substantial evidence that such drug will have the effect it purports or is represented to have," when used in FDA regulations involving withdrawal of approval of NADAs, *see* 21 C.F.R. § 514.-115(b)(3)(iii) (1977), does not include by reference the combination drug requirement of § 514.1(b)(8)(v). The regulations involving withdrawal of an NADA also do not reference FDA criteria for adequate and well-controlled investigations. *See* 21 C.F.R. § 514.111(a)(5) (1977). The Act, however, requires a demonstration of the same "substantial evidence" regardless of whether FDA is contemplating approving or withdrawing an NADA. *See* 21 U.S.C. § 360b(d)(3). To suggest that FDA may not refer to regulations articulating the meaning of the term "substantial evidence" merely because there is no cross reference in the Code of Federal Regulations does violence to common understanding. It would result in the establishment of an incongruous double standard for determining sufficiency of data, a result for which petitioner has demonstrated no logical basis or justification.

cise" regulation 21 C.F.R. § 314.-111(a)(5)(ii)(a)(5) (1977), which provides that the plan or protocol for a study must include a "summary of the methods of analysis and an evaluation of data derived from the study, including any appropriate statistical methods." *Compare* 21 C.F.R. § 514.-111(a)(5)(iv) (1977), *supra* note 2. The Court stated that "[a] mere reading of the study submitted will indicate whether the study is totally deficient in this regard." 412 U.S. at 621 n. 17, 93 S.Ct. at 2479.[9] Although we have elsewhere noted that the FDA regulations defining "well-controlled investigations" cannot be categorically classified as precise or imprecise, *Cooper Laboratories, Inc. v. FDA,* 163 U.S.App.D.C. 212, 220, 501 F.2d 772, 780 (1974), we conclude in this case that, since Masti-Kure's field investigations violate manifestly clear regulations, FDA must be sustained in its order of summary judgment.

■ In its 1973 study Masti-Kure infected cows with mastitis caused by both strep and staph. Approximately 20% of the infected cows were randomly selected to serve as no-treatment controls. The remaining cows were treated by the drug covered by NADA 65–381. FDA's criticism of this study was that it logically proved only that treatment by the drug covered by NADA 65–381 was more effective than do-

ing nothing, and thus that it failed utterly to demonstrate whether the combination drug was more effective than either penicillin or neomycin alone, as required by 21 C.F.R. § 514.1(b)(8)(v) (1977). According to regulatory standards, the latter conclusion can be demonstrated only by comparing the effect of the drug covered by NADA 65–381 on a test population against the effect on control populations of neomycin and penicillin. *See* 21 C.F.R. § 514.111(a)(5)(vi), *supra* note 2. The regulatory requirement that a "well-controlled investigation" include a control group is precise, and since Masti-Kure completely failed to comply with it, we sustain FDA's finding that the 1973 study is conclusively "inadequate or uncontrolled in light of the pertinent regulations." *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 622, 93 S.Ct. 2469, 2479, 37 L.Ed.2d 207 (1973).

In its 1974 field investigation, Masti-Kure combined the results of experiments on three separate herds: the Harvey herd, the Cleveland herd, and the Reeves herd. Parts of the udders (quarters) of the cows in these three herds were infected with staph and strep.[10] All quarters treated in the Harvey and Cleveland herds were treated with penicillin, 100,000 units.[11] In the Reeves herd tests were conducted using both the drug

---

9. The Court also noted that

  Some of the regulations, however, are not precise, as they call for the exercise of discretion or subjective judgment in determining whether a study is adequate and well controlled. For example, [§ 314.-111(a)(5)(ii)(a)(2)(i)] required that the plan or protocol for the study include a method of selection of the subjects that provide "*adequate* assurance that they are suitable for the purposes of the study." (Emphasis added.) The qualitative standards "adequate" and "suitable" do not lend themselves to clear-cut definition, and it may not be possible to tell from the face of a study whether the standards have been met. Thus, it might not be proper to deny a hearing on the ground that the study did not comply with this regulation.
  412 U.S. at 621 n. 17, 93 S.Ct. at 2479.

10. The distribution of *Streptococcus agalactiae* infections in the treated quarters was: 47 quarters in the Harvey herd; 15 quarters in the Cleveland herd; and 84 quarters in the Reeves herd. The distribution of *Staphylo-*

*coccus aureus* infections was 7 quarters in the Harvey herd; 10 quarters in the Cleveland herd; and 11 quarters in the Reeves herd. . . . Each herd had an untreated control group. For the Harvey herd, 10 quarters infected with *S. agalactiae* and 2 infected with *Staphylococcus aureus* were left untreated. For the Cleveland herd, one quarter infected with *S. agalactiae* and two quarters infected with *Staphylococcus aureus* were left untreated. For the Reeves herd, 15 quarters infected with *S. agalactiae* and 3 quarters infected with *Staphylococcus aureus* were left untreated.

  41 Fed.Reg. at 7146.

11. The cure rate for those cows treated in the Harvey herd was 33/34 for *Streptococcus agalactiae* infections and 3/5 for *Staphylococcus aureus* infections. The cure rate in the Cleveland herd for *Streptococcus agalactiae* infections was 14/14 and for the *Staphylococcus aureus* infections, 1/5. . . .

  *Id.*

covered by NADA 65–381 and penicillin, 100,000 units. Those quarters in the Reeves herd which were infected with strep and which were treated with penicillin demonstrated a cure rate of 28/30.[12] Those infected with strep and treated with the experimental drug demonstrated a 35/36 cure rate. The cure rates for quarters in the Reeves herd infected with staph, however, were 3/5 for penicillin and 1/2 for the drug covered by NADA 65–381.[13]

■ FDA regulations require that an adequate and well-controlled investigation include a "method of selection of the animals to be studied and those to serve as controls" which "provides for . . . Assignment of the animals and control groups to test under conditions which exclude or minimize bias." 21 C.F.R. § 514.111(a)(5)(ii)(b), *supra* note 2. In addition FDA regulations require such an investigation to include "[a] description of the steps taken to document comparability of variables such as species, age, sex, duration, and severity of disease, management practices, and use of drugs other than those being studied." 21 C.F.R. § 514.111(a)(5)(iv), *supra* note 2. These requirements are particularly important with respect to Masti-Kure's 1974 field investigation, since the drug covered by NADA 65–381 was used only on the Reeves herd and not randomly applied to the cows studied. The test group was thus drawn exclusively from the Reeves herd, whereas the control group (insofar as effectiveness under the combination drug policy was to be demonstrated) consisted of cows drawn from all three herds. FDA notes that herds of cows are likely to differ according to important variables, such as management practices, sanitation, and general health. See 41 Fed. Reg. at 7146. The 1974 field investigation, however, fails to provide *any* "description of the steps taken to document comparability" of test and control groups. No explanation at all was offered for the odd distribution of test animals. We conclude that the investigation's complete violation of the letter and spirit of FDA regulations renders it conclusively inadequate.[14] See *Weinberger v. Hynson, Wescott & Dunning,* 412 U.S. 609, 621 n. 17, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973).

■ Masti-Kure also attempts to combine the data of the 1973 and 1974 field studies so as to produce yet a third set of results. This procedure is unacceptable, however, because, among many other reasons, Masti-Kure has failed to provide a "description of the steps taken to document comparability of variables" among the test and control groups thus constituted. The issue is not, as Masti-Kure phrases it, whether "multiple data studies in different years" is forbidden by FDA regulations, reply brief for petitioner at 22, but whether, if such multiple data studies are attempted, an adequate description of the steps taken to assure comparability is also included. Since Masti-Kure did not include such a description, we agree with FDA that pooling of the data is impermissible.

12. These figures are from Masti-Kure's May 9 submission.

13. FDA noted that:
The Reeves herd was the only herd in which both the penicillin-neomycin combination and penicillin alone were studied; therefore, with the high comparability of variables likely to obtain in a single herd, comparison of the results of treatment with the two drugs in that herd should be reliable. Notably, the data for the Reeves herd fail to substantiate the claim of superior effectiveness for the combination over penicillin alone in a statistically significant manner against either *Streptococcus agalactiae* or *Staphylococcus aureus* infections. Specifically in the case of *Staphylococcus aureus* infections—for which the combination is supposed to be of principal value because of the relative ineffectiveness of penicillin—the combination cured one of two quarters, penicillin three of five.
41 Fed.Reg. at 7146.

14. We interpret the affirmative obligation imposed by 21 C.F.R. § 514.111(a)(5)(ii)(b) to forbid Masti-Kure from arguing that § 514.111(a)(5)(iv) requires only a "description" of the steps taken to document comparability, and if no such steps were in fact taken, no description need be offered. If Masti-Kure failed to take any steps to ensure comparability, then it also failed to comply with the requirement of § 514.111(a)(5)(ii)(b) that it adopt a method of assigning animals to test and control groups so that bias would be minimized or excluded.

Masti-Kure submitted a third study in support of its claim for the effectiveness of the drug covered by NADA 65–381. *See* note 6 *supra.* Both in its proposed order of March 5, 1975, and in its final order of February 17, 1976, FDA characterized this third study as a clinical rather than a field investigation. Although this court is unaware of the criteria distinguishing field from clinical investigations, Masti-Kure did not contest FDA's characterization of Masti-Kure's third study in its May 9th submission to the agency, nor does Masti-Kure now dispute FDA's characterization in its briefs before this court. Therefore, since Masti-Kure failed to submit, as required by statute, any adequate and well-controlled field investigations, we conclude that FDA's order withdrawing approval from NADA 65–381 and denying a hearing must be affirmed.[15]

*So Ordered.*

---

**15.** After close examination of the record we find to be groundless petitioner's allegations that FDA's treatment of Masti-Kure has been "vindictive and improper." Brief for petitioner at 45.