**UNITED STATES of America, Libelant,**

v.

**An ARTICLE of DRUG Consisting of 22 30-Tablet Bottles, 40 100-Tablet Bottles, and 13 250-Tablet Bottles, Each Individually Cartoned and LABELED in part: (Bottle and Carton) "WYNN 30 SUSTAINED–MEDICATION TABLETS QUINAGLUTE (QUINIDINE GLUCONATE) DURA–TABS, etc., Respondent.**

**No. 64 C 450(1).**

United States District Court
E. D. Missouri, E. D.

March 29, 1967.

Richard D. FitzGibbon, Jr., U. S. Atty., Stephen H. Gilmore, Asst. U. S. Atty., St. Louis, Mo., for libelant.

Bernstein, Kleinfeld & Alper, Washington, D. C., D. Jeff Lance, Cook, Murphy, Lance & Mayer, St. Louis, Mo., for respondent.

HARPER, Chief Judge.

## MEMORANDUM OPINION

The United States of America, libelant, instituted the present action by filing a libel of information (civil action in rem) seeking the seizure and condemnation under 21 U.S.C.A. § 334(a) of a certain quantity of drugs known as Quinaglute Dura-Tabs (hereinafter referred to as Quinaglute). The libel of information charged that the Quinaglute, when introduced into interstate commerce, violated 21 U.S.C.A. § 355(a), in that it was a "new drug" for which no new drug application had been applied for or approved. Pursuant to the libel of information, this court issued a warrant and monition ordering the seizure of the quantity of Quinaglute. The drugs were seized at the Narco Drug Company of St. Louis and now form the jurisdictional *res*.

Notice of the seizure was duly published, and Vitamix Pharmaceuticals, Inc. (hereinafter referred to as Vitamix), claimant herein, filed a claim of ownership of the seized drugs and an answer to the libel of information.

The facts are before the court by way of oral testimony, depositions, and various exhibits, including a box of the seized drugs, along with the package insert.

Quinaglute has been manufactured since 1957 by the Wynn Pharmacal Company, a division of the claimant Vitamix. The active ingredient of the drug is quinidine. Quinidine is recognized as being helpful in the treatment of heart conditions known as cardiac arrhythmias, which is, in laymen's language, an abnormally beating heart. The types of arrhythmias range from those which cause no great threat to the patient's life to those like ventricular tachycardia, which is extremely dangerous. There are two phases in correcting a cardiac arrhythmia: One, *conversion* of the abnormally beating heart to a normally beating heart or a normal sinus rhythm; and two, *maintenance* of the normal heart rhythm after conversion. Quinidine is helpful in both phases.

Quinidine is a very tricky drug to administer because, besides have a therapeutic effect, it is also a very potent protoplasmic poison. Since the ration between toxicity and non-toxicity is very close and varies from individual to individual, the problem is to determine the correct therapeutic level. The problem is particularly acute with the more serious forms of cardiac arrhythmias where if too little of the drug is administered the patient may die, and the patient might also die if too much is given. Consequently, when the drug is administered the patient's blood and plasma levels and heart rhythm must be closely watched.

Quinaglute differs from other quinidine forms in basically two respects: First, the quinidine in Quinaglute is contained in a salt form known as quinidine gluconate. Quinidine gluconate is reputed to be better tolerated by the stomach than other forms of quinidine, but the testimony is conflicting on this point. Second, in addition to the quinidine gluconate, Quinaglute contains castor wax and magnesium stearate which are reputed to give the drug a long-lasting, even effect, without ups and downs. The evidence does indicate that castor wax contained in a drug might give the drug a long lasting effect; however, the exact longevity and the smoothness with which the drug is released depends upon many unstable facts as, e. g., temperature, age, etc.

Quinaglute is distributed in boxes which also enclose what is known as a package insert. The package insert with Quinaglute contains, in part, the following language:

"Each QUINAGLUTE DURA-TAB contains 5 gr. (o.33 Gm.) quinidine gluconate. Medication is released at a carefully controlled rate to assure predictable, prolonged, even level of therapeutic activity.

"Dr. Bellet and his associates developed and clinically studied, QUINAGLUTE DURA-TABS, quinidine gluconate sustained-medication tablets, a more efficient, better tolerated, more convenient form of quinidine. They provide these advantages:

"SIMPLE DOSAGE SCHEDULE * * * Each dose provides effective, uniform quinidine plasma levels for up to 12 hours, so that q. 12 h. dosage usually maintains normal sinus rhythm all day and all night. No night dosage needed.

"BETTER TOLERATED * * * Quinidine Gluconate is better tolerated by the gastro-intestinal tract for two reasons: (1) Quinidine gluconate is 10 times as soluble (1 in 9 parts of water) as Quinidine Sulfate (1 in 90 parts of water) and thus better absorbed than the sulfate; (2) only a fraction of the daily dose of QUINAGLUTE quinidine is absorbed via the gastric mucosa; the balance is slowly absorbed along the intestinal tract.

"MORE EFFICIENT * * * Uniform, constant therapeutic blood levels virtually eliminate valleys in plasma concentration, and so markedly reduce the tendency to recurrence of arrhythmias.

"LONG ACTING * * * These sustained-medication tablets are produced by a special process to assure the release of the active drug at a carefully controlled rate and obtain a predictable, prolonged, smooth level of therapeutic activity. There are no sudden, abrupt rises in blood levels, no up-hill-down-dale effects. Each dose maintains plasma levels from 10 to 12 hours.

## "INDICATIONS

"Conversion to and maintenance of normal sinus rhythm in the following arrhythmias: premature contractions (nodel and ventricular), atrial tachycardia, flutter, fibrillation (established or proxysmal) and ventricular tachycardia; for maintenance therapy following conversion to normal sinus rhythm by electric countershock. It is also of value in the treatment of night leg cramps.

## "DOSAGE

"The quantity necessary for adequate therapeutic effect—yet short of toxicity—must be ascertained in each patient. It should be noted that Quinidine Gluconate contains 62.3 per cent anhydrous quinidine whereas Quinidine Sulfate contains 82.86 per cent of quinidine, and this should be taken into consideration in prescribing. For example, 10 grains (2 Dura-Tabs) contain 6.2 grains of the quinidine alkaloid whereas 10 grains of Quindine Sulfate contain 8.3 grains of the quinidine alkaloid.

"FOR CONVERSION * * * in most cases. 2 QUINAGLUTE DURA-TABS (quinidine gluconate) 3 or 4 times a day for 2 to 3 days * * * larger doses and/or longer periods are required for some patients.

"FOR MAINTENANCE * * * 1 or 2 QUINAGLUTE DURA-TABS (quinidine gluconate) q. 12 h.

## "PRECAUTIONS

"Nausea, vomiting, respiratory distress, headache, vertigo, or ringing in the ears indicate idiosyncrasy or overdosage. (An initial test dose of quinidine sulfate should be administered to determine possible hypersensitivity to quinidine.) Embolism or ventricular fibrillation result more frequently in patients with long-standing valvular disease.

## "CONTRAINDICATIONS

"In patients with bacterial endocarditis, marked cardiac enlargement with failure, partial a–v or complete heart block, marked grade of QRS widening; in patients who have shown sensitivity reactions to quinidine; in senility."

The above package insert or one substantially identical thereto has been included with Quinaglute Dura-Tabs since before the October 10, 1962, amendment to 21 U.S.C.A. § 321(p).

21 U.S.C.A. § 321(p) provides:

"(p) The term 'new drug' means—

"(1) Any drug the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety *and effectiveness* of drugs, as safe *and effective* for use under the conditions prescribed, recommended, or suggested in the labeling thereof * * *." (The words italicized were added by the amendment of October 10, 1962.)

The amendment of October 10, 1962, section 107(c) (4) of Pub.L. 87–781 [see 21 U.S.C.A. note following § 321(v)] also provides:

"(4) In the case of any drug which, on the day immediately preceding the enactment date, (A) was commercially used or sold in the United States, (B) was not a new drug as defined by section 201(p) of the basic Act as then in force [subsec. (p) of this section], and (C) was not covered by an effective application under section 505 of that Act [section 355 of this title], the amendments to section 201(p) [subsection (p) of this section] made by this Act shall not apply to such drug when intended solely for use under conditions prescribed, recommended, or sug-

gested in labeling with respect to such drug on that day."

(This section is known informally as the "Grandfather Clause.")

21 U.S.C.A. § 355 provides in part:

"(a) No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) of this section is effective with respect to such drug."

In the light of the above sections of 21 U.S.C.A., the sole issue in this case is whether the drug Quinaglute Dura-Tabs, at the time of its seizure, was generally recognized by experts in the field, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof. If Quinaglute was not generally recognized as safe and effective then the drug was subject to being classified as a new drug, and as such could not be shipped in interstate commerce without the prior approval of a new drug application. It is stipulated by the parties that no new drug application was ever made for Quinaglute.

The claimant Vitamix contends that Quinaglute was not a new drug on October 10, 1962, and therefore, under the Grandfather Clause (supra) the effectiveness test of 21 U.S.C.A. § 321(p), added by the amendment of October 10, 1962, is not applicable to this drug. The United States, on the other hand, contends that Quinaglute is and was on October 10, 1962, a new drug within the meaning of 21 U.S.C.A. § 321(p).

In view of the claimant's relying on the Grandfather Clause, the first issue before the court is whether Quinaglute was a new drug on October 10, 1962. If Quinaglute was not generally recognized by experts in the field as safe under the conditions prescribed, recommended or suggested in the labeling thereof, then it was a new drug on October 10, 1962.

As may be noted from the excerpt of the package insert (supra), Quinaglute is purported to be useful and safe for the conversion and maintenance of virtually every type of cardiac arrhythmia, and, in addition, it is reputed to be useful in the treatment of night leg cramps.

With regard to the safety of Quinaglute, the testimony at the trial indicated that it is both safe and effective for the maintenance of cardiac arrhythmias. The court reaches this conclusion from the fact that at the time of the trial Quinaglute had been used for a period of eight years in the maintenance of cardiac arrhythmias with millions of the pills having been sold, and in all of that time there was not one complaint that Quinaglute was either unsafe or ineffective for the maintenance of a normal sinus rhythm.

With regard to the safety of Quinaglute in the conversion of cardiac arrhythmias, the testimony at the trial indicated that it is definitely not safe for the conversion of the serious type of cardiac arrhythmia known as ventricular tachycardia, and such fact is admitted by the claimant in its brief (p. 67), to-wit:

"For ventricular tachycardia, which must be treated as promptly as possible and for which no oral medication is generally considered effective (testimony cited), all of the expert testimony given at the trial would indicate that neither Quinaglute nor quinidine sulfate should be employed (testimony cited). Consequently, if this court were to conclude that the new drug status of Quinaglute is to be determined under the current definition of a new drug in that Section 107(c) (4) of P.L. 87–781 is not applicable, claimant could not realistically dispute a finding of fact that, when offered for the conversion of ventricular tachycardia, Quinaglute is subject to new drug classification."

Further, the testimony indicated that many experts have substantial reservations about the usefulness and safety of Quinaglute for the conversion of cardiac arrhythmias in general, because, in converting the heart to a normal sinus

rhythm, it is desirable for the drug to reach its peak effect immediately (the doctor should know when this will occur), but with Quinaglute the effects of the quinidine are spread out over a period of hours. Also, since quinidine, the active ingredient of Quinaglute, is a protoplasmic poison if too much of the drug is administered, and Quinaglute being a long-acting drug, it is considered an unnecessary hazard to the patient to use Quinaglute or any other long-acting drug for the purposes of conversion.

The foregoing facts clearly demonstrate that Quinaglute was not generally recognized by experts as safe for all of the conditions prescribed, recommended or suggested in its labeling on October 10, 1962, and was, therefore, a new drug on October 10, 1962. Further, such facts indicate that Quinaglute is now a new drug under 21 U.S.C.A. § 321(p) as amended.

Since Quinaglute was a new drug on October 10, 1962, the court may also consider whether it is recognized by experts as effective for all of the conditions prescribed, recommended or suggested in the labeling thereof; however, such a determination is unnecessary because, as noted above, Quinaglute was on October 10, 1962, and is now, a new drug within the meaning of 21 U.S.C.A. § 321(p) as amended. Nevertheless, the court might add that there is no evidence that Quinaglute is effective for the treatments of night leg cramps.

For the foregoing reasons the seized article, the Quinaglute Dura-Tabs, was a new drug under the provisions of 21 U.S.C.A. § 321(p) as amended, at the time of its seizure, and is, therefore, liable for seizure and condemnation pursuant to the provisions of 21 U.S.C.A. § 334.

This memorandum opinion is adopted by the court as its findings of fact and conclusions of law, and the clerk of the court is directed to enter an order condemning the seized article. The seized article may properly be shipped in inter-state commerce only after the claimant has complied with the new drug application procedure of 21 U.S.C.A. § 355, United States v. Allan Drug Corp., 357 F.2d 713 (CA 10).